**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARISSA T. JONES, ESQ.,

                Plaintiff,

        v.

GOLDBERG SEGALLA LLP and FREDERICK
J. POMERANTZ, ESQ.,

                Defendants.

___ Civ. ___

**COMPLAINT**

Plaintiff Marissa T. Jones, Esq. ("Jones"), by her undersigned attorneys, Reavis Parent Lehrer LLP, for her Complaint against defendants Goldberg Segalla LLP ("Goldberg Segalla" or the "Firm") and Frederick J. Pomerantz, Esq. ("Pomerantz"), a partner of the Firm (together, the "Defendants"), alleges as follows:

## NATURE OF ACTION

1.     Jones brings this action against Goldberg Segalla and Pomerantz, a partner of the Firm who was once one of Jones' direct supervisors, for unlawful discrimination, harassment, hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*; and the New York City Civil Rights Law, § 8-101 *et seq.*

2.     Jones, an experienced attorney with a specialty in insurance regulation, was heavily recruited by Goldberg Segalla to join its growing Global Insurance Services Practice Group. The Firm's management assured Jones, who was then in her eighth year of law practice and also a parent with substantial childcare responsibilities, that she would be permitted a flexible schedule and telecommuting in accordance with the Firm's "family-friendly" culture and practices. The Firm promoted the attorney position as one where Jones could work hard, excel

and grow, and succeed at the Firm, while balancing certain family responsibilities with greater ease.  On this basis, Jones rejected a competing job offer as in-house counsel at an insurance company and joined the Firm on April 29, 2013.

3.      At first things went well at the Firm and Jones' hard work was appreciated and praised.  However, this all changed when Pomerantz became a member of the Firm the following year and joined its New York Office and the Global Insurance Services Practice Group in which Jones worked.

4.      Jones was assigned by the Firm to work with Pomerantz, a 30-year veteran attorney.   Pomerantz immediately exhibited a discriminatory animus toward women, and especially toward Jones and her care of her children.  Among other things, Pomerantz repeatedly and aggressively criticized Jones' telecommuting and her moderately flexible schedule. Ironically, he criticized Jones for practicing what the Firm had preached.  Pomerantz quickly began to micromanage Jones, and indeed spy on her, while giving a free pass to a comparable male colleague with his own significant childcare responsibilities.   Pomerantz, over Jones' protests, advised Jones that she was unfit to travel for the Firm or for client or other professional meetings, on the explicit ground that childcare responsibilities prevented Jones from doing so.

5.      Jones was generally well regarded and highly rated professionally in the Firm's work performance reviews.  However, Pomerantz did not treat Jones with respect, talked to her in a condescending and demeaning manner that was very different from his approach to his male colleagues, and repeatedly made comments to Jones that were untrue, about her gender, her children, her family situation, her personal life, and her desire and ability to work and take on professional responsibilities.

6.    Pomerantz even reduced his bias to writing, stating in a written performance review of Jones that her family commitments showed that she was not prepared to work hard and make the necessary "sacrifices" to grow at the Firm.

7.    There were many at the Firm who witnessed or were otherwise fully aware of Pomerantz's discriminatory treatment of Jones, but no one reined him in.

8.    To add insult to injury, Pomerantz, when meeting with Jones (and, Jones was told, others at the Firm), would repeatedly touch his genital area – which Jones found to be both disturbing and repellant.

9.    On Monday, March 16, 2015, Jones spoke with a Human Resources representative of the Firm, Katherine Sgroi ("Sgroi").   Jones was frustrated with the offensive gender-based comments made by Pomerantz that morning and Jones described to Sgroi in detail Pomerantz's recent remarks to her;  his pattern of discriminatory attitudes, communications and conduct toward Jones;  and his repeated touching and rubbing himself in his genital area in Jones' presence, in the presence of others, and during meetings with Jones.

10.    Sgroi was apparently disturbed by what she heard and promised Jones that she (Sgroi) would investigate and document Jones' claims.  Sgroi later contacted Jones and advised her that she (Jones) needed to discuss the issues that Jones had raised with Sgroi with the Firm's partner and co-Chair of the Global Insurance Services Practice Group, Daniel W. Gerber, Esq. ("Gerber"), and that neither she (Sgroi) nor anyone else in Human Recourses would address the matter.  Jones asked Sgroi to confirm that she (Sgroi) would document their conversations and Jones' concerns, but to Jones' knowledge, Sgroi never did so.

11.    After not hearing from Sgroi for several days, and starting to question whether Sgroi would in fact document their discussions or do anything to respond to the concerns Jones

had reported to her, on Thursday, March 19, 2015, Jones sent a lengthy email to Gerber detailing what Jones had discussed with Sgroi earlier in the week and providing even greater information about the specific issues and complaints Jones had involving Pomerantz.

12.     That very afternoon, the Firm abruptly terminated Jones' employment without any notice.   This was raw and swift discriminatory retaliation by a law firm – a firm of experienced lawyers who should be held to the highest standards of compliance with the anti-discrimination laws, but who acted in utter disregard of their employee and those laws.

## JURISDICTION AND VENUE

13.     Jones seeks damages sustained as a result of Defendants' unlawful conduct in an amount to be proven at trial, but believed to be in excess of $1,000,000, as well as punitive damages in the amount of no less than $1,000,000, attorneys' fees, interest and costs.

14.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331, in that it involves a federal question under the employment discrimination laws of the United States, particularly 42 U.S.C. § 2000e *et seq*. and 29 U.S.C. § 206(d).   This Court has supplemental jurisdiction over Jones' state and local statutory claims under 28 U.S.C. § 1367(a) because such claims arise from the same or closely related conduct of Defendants.

15.     This Court has personal jurisdiction over Defendants because:   (i) Defendant Goldberg Segalla's principal place of business is in the State of New York;   (ii) upon information and belief, Defendant Pomerantz resides in and maintains an office in the State of New York; and (iii) Defendants intentionally acted in such a way as to cause injury to Plaintiff Jones in the State of New York.

16.     Venue is proper in this district by virtue of 28 U.S.C. §§ 1391 (b) and (c), because this is the judicial district in which a substantial part of the events or omissions giving rise to the

claims occurred, and because each of the Defendants is subject to personal jurisdiction within the district.

<b><u>PARTIES</u></b>

17.     Plaintiff Jones is an individual who resides in Staten Island, New York.

18.     Upon information and belief, Defendant Goldberg Segalla is a limited liability partnership organized and existing under the laws of the State of New York, having its principal place of business at 665 Main Street, Suite 400, Buffalo, New York 14203, and maintaining an office at 600 Lexington Avenue, Suite 900, New York, New York 10022, where both Plaintiff Jones and Defendant Pomerantz were based.

19.     Upon information and belief, Defendant Pomerantz is an individual who resides in the State of New York, is an equity partner of Defendant Goldberg Segalla and maintains an office at 600 Lexington Avenue, Suite 900, New York, New York 10022.

20.     Upon information and belief, following his joining Defendant Goldberg Segalla, Defendant Pomerantz played a major role in decision-making on employment and other matters within the Firm's Global Insurance Services Practice Group, of which Jones was a part.

<b><u>FACTS COMMON TO ALL CLAIMS</u></b>

**A.     <u>Jones' Educational Background and Employment History</u>**

21.     Jones graduated from Brooklyn College in 2001 and New York Law School in 2004.   Jones has practiced law for over ten years, focusing primarily on regulatory affairs, legal compliance and quality management, with a particular emphasis on the insurance industry. Jones has served as a trusted advisor to senior management in matters related to ethical business practices, risk management and regulatory compliance.

22.     Jones began her legal career at Skadden, Arps, Slate, Meagher & Flom LLP, a major international law firm.  Jones then accepted an in-house position at Starr Underwriting Agencies, LLC, a major insurance underwriting firm, for which Jones took on wide-ranging regulatory responsibilities.  Jones then joined its related company, Starr International USA, Inc., where Jones served as regulatory affairs legal counsel for two start-up insurance companies specializing in property and casualty, commercial, specialty and surplus lines insurance.  For nearly two years, Jones served as a legal compliance manager for Parsons Brinckerhoff, Inc. ("Parsons"), a major multinational engineering and design firm.

23.     By early 2013, Parsons had decided to relocate certain of its service operations to Lancaster, Pennsylvania, including Jones' position.  Jones could have relocated to Pennsylvania as well and continued in that role with Parsons and indeed was offered the opportunity to do so, but she wanted to remain in the New York City area where her family is located.  Jones voluntarily sought new employment.

24.     Jones is very ambitious and hard working.  But like many people, she has family responsibilities as well as a career.  In 2012, Jones had her first child, a son.  Because her husband has substantial work and travel commitments, Jones wished to be more available to travel to and from daycare on a regular basis and be home for her young son several nights per week.  Accordingly, for her job after Parsons, Jones was looking for a position that offered a balance between work and family.

25.     Jones thought she had found that balance at Goldberg Segalla, which explicitly promoted itself, generally and to Jones specifically, as a flexible and "family-friendly" law firm, with a "family-friendly" culture and practices such as flexible work hours and telecommuting, where a working mother could easily balance work and family responsibilities.

**B.      Jones' Recruitment to the Firm**

26.     In the beginning of 2013, Jones was initially introduced and recruited to the Firm by Charles J. Karvelas, Esq., a legal recruiter and partner at SRA-USA, Inc., who worked closely with the Firm.  Karvelas represented to Jones that Goldberg Segalla is a "virtual firm," a flexible "family-friendly" place that was objectively rated one of the "Best Places to Work" by various rating groups.

27.     Goldberg Segalla as a firm was specifically promoted to Jones by both Karvelas and Firm management as being:  (a) a great place for women in particular to work because of its flexible and "family-friendly" practices including flexible work hours and telecommuting;  (b) a place where the Firm's lawyers could work from different locations seamlessly;  and (c) a place where Jones could grow and have a successful career while at the same time meeting certain parenting preferences and responsibilities.  And conversely, at no time was Jones ever advised by Karvelas or Firm management or anyone else that the Firm would impose any work or career limitations on those taking advantage of the very practices the Firm espoused.

28.     The Firm also trumpeted its lifestyle ratings on its website with statements such as the following:

> "We are exceptionally pleased to be ranked as the No. 1 place to work in Western New York, and among the top employers in the state," said Richard J. Cohen, Goldberg Segalla's Managing Partner.  "These survey results reflect not just our culture, but our core hiring philosophy, namely that every member of our team must be excellent at what they do — and an even better human being.  This commitment has led to rapid growth that's been entirely organic, and a firm culture in which everyone contributes at a high level."

http://www.goldbergsegalla.com/achievement/goldberg-segalla-earns-no-1-spot-best-places-work-wny-top-20-ranking-statewide (annexed as **Exhibit A** hereto).

29.     This sort of press was sought and encouraged by the Firm.  For example, as of approximately the time of Jones' termination, a website called "Great Rated!™" (now called "Great Place to Work® Institute, Inc.") which rates companies on their work lifestyle and evidently cooperates with the management of the companies it rates, included the following quotation from an unnamed Goldberg Segalla employee:

> "Goldberg Segalla demonstrates a real commitment to the welfare of its employees.  If you have a personal issue that is interfering with your work, you will be given ample time to deal with it and will not be penalized for doing so."

(selections annexed as **Exhibit B** hereto).

30.     Another Goldberg Segalla employee went even further:

> "There is an understanding that family always comes first.  When there is a sick child or unexpected illness in the family, it has been my experience that family is the priority and should always be the priority.  Which brings me to another unique point: the ability to work remotely.  That luxury allows more flexibility when family things come up but still gives you the opportunity to stay on top of your job if needed or desired."

*Id.*

31.     Moreover, according to and as represented by the "Work-Life Balance" section of the "Great Rated!™" website, ten percent (10%) of the Firm's employees were on a flexible work schedule and thirty-five percent (35%) of the Firm's employees used a telecommuting option. *Id.*

32.     During Jones' active recruitment to the Firm in March 2013, partners of the Firm, including Richard J. Cohen, Esq., Managing Partner of the Firm;  James Wrynn, Esq., the former Superintendent of the New York Insurance Department;  and Gerber, also an equity partner and co-Chair of the Firm's Global Insurance Services Practice Group, all urged Jones to join the Firm.  They each represented to Jones that the Firm was intent on growing its insurance

regulatory practice and that Jones' experience and skills would enhance and provide important support for that growing area of the Firm.

33.     Jones explained that she had an infant at home (her son was seven months old at the time of her interview);  that she would not be able to bill typical law firm hours at the office; and that she had another concrete job offer in hand for an in-house position at a major insurance company which could accommodate her needs.  Jones advised the Firm's partners that she would have to pick up her son from daycare at least three days a week, although with notice she could make alternative arrangements.

34.     Jones was assured that this would not be a problem.  The Firm's partners assured her that Goldberg Segalla, because of its "family-friendly" and flexible practices, the high value it places on accommodating diverse work routines, and its "virtual" office environment and telecommuting practice, was the better choice for her.  They stated that the Firm's regulatory work was of a type which was compatible with flexible scheduling and telecommuting.

35.     The Firm's partners also assured Jones that she would not be judged on a typical "hours billed" basis because the Firm was focused on building an insurance regulatory practice. Jones was told a good portion of her time would be spent on non-billable events and Firm initiatives in connection with such.

36.     Based on all these representations, Jones accepted the Firm's offer and joined Goldberg Segalla with high hopes of a satisfying career where Jones could balance her work and family needs.

37.     At first, the arrangement went well.  Jones worked closely with Wrynn, a leader of the Global Insurance Services Practice Group, to assist in building the Firm's regulatory practice.  Jones worked very hard and effectively on client and regulatory practice matters within

the flexible schedule originally offered and afforded by the Firm, working late or on weekends at home when projects required it.

38.    Jones also worked outside the office, attending "pitch meetings" for clients and professional meetings on the Firm's behalf, such as the National Association of Insurance Commissioners ("NAIC") Conferences.   Jones sometimes needed some advance notice with childcare and other matters, but on the whole the working relationship was highly successful.

**C.**    **Pomerantz Joins the Firm, and Harasses and Discriminates Against Jones**

39.    In June 2014, Jones had a second child and took maternity leave for a mere six (6) weeks.

40.    When Jones returned from maternity leave the next month in July 2014, Pomerantz was there.  Jones was assigned by the Firm to work with Pomerantz who had joined the Firm that summer as a partner in the New York Office, in the Global Insurance Services Practice Group, in which Jones worked.

41.    As detailed below, it soon became evident that Pomerantz did not approve of Jones' working while being a mother, or her telecommuting, or her flexible schedule, which the Firm had previously advertised, encouraged and approved.  Moreover, it became evident that Pomerantz had concluded that women with childcare responsibilities were not to be working at all;  they were not to be trusted with Firm clients, not to be trusted with client development, and not to be trusted with Firm-wide responsibilities at all.  Finally, as detailed below, Pomerantz instituted a bizarre campaign of inappropriate treatment, sexual and otherwise, and harassment and retaliation targeted against Jones.

42.    Pomerantz had no legitimate basis for criticizing Jones' overall work or work ethic.  Jones took the opportunities provided by the Firm to telecommute and have a somewhat

flexible schedule – having been promised and assured the Firm would support her through its "family-friendly" culture and practices.  In particular, Jones performed professionally at a high level of competence and made sure that when she was telecommuting during business hours, or even attending to family matters on "off" hours, she was always reasonably and responsibly available.  Jones had answered calls while at doctors' appointments, while in parent-teacher meetings, while on the bus commuting to or from work, and even when she had given prior notice that she would be unavailable during specific times.  Jones made herself available on weekends even when matters did not require urgency.  Jones worked late into the evenings and nights when matters required her to do so, both inside and outside of the office.  She was a dedicated, skilled and committed associate of the Firm in all respects.

       1.      **<u>Discriminatory Comments and Limitation of Duties</u>**

     43.     After learning of Jones' telecommuting arrangements with the Firm, following Jones' return from her short maternity leave in the summer of 2014 and continuing throughout her employment at the Firm until she was summarily terminated, Pomerantz made direct and numerous comments to Jones regarding her family and personal life, which were clearly designed as criticism and condemnation of her life choices, her family status and her gender.

     44.     Pomerantz also communicated his stereotypical views that because Jones was a woman with childcare responsibilities, Jones should not be treated equally to her peers, and should not be entrusted with client or Firm matters or given full responsibilities within the Firm.

     45.     For example, in the Fall of 2014, when discussing a business trip to meet a potential client, Pomerantz remarked, in words or substance:  "How would you go?  You can't go with your home situation."  Jones told Pomerantz that she never said she could not go on business trips, that she was more than happy to do so, that she wanted to do so, and that she

would just need a little notice so she could make proper arrangements for her family.  Jones told Pomerantz that she had previously attended an out of town NAIC Conference while working with the Firm when she had an infant at home, and was willing and happy to go on a similar trip when she was eight months pregnant, though the trip was canceled by the Firm.  In response, Pomerantz flatly told Jones that he did not see how she could go on business trips because she had a family.

46.    Pomerantz referred to this limitation on Jones' activities several times over the course of her work at the Firm.  He repeatedly discouraged Jones from travelling to attend key client or professional meetings because of her family responsibilities.

47.    Pomerantz even raised the "issue" of Jones' children in writing in her annual written performance review (the "Performance Review"), dated October 15 and 23, 2014 (copy annexed hereto as **Exhibit C**).  This was the last performance review which Jones received prior to her sudden termination.

48.    In general, the Global Insurance Services Practice Group expressed its pleasure with Jones' performance, work product, time commitment and dedication to the Firm – there was not the least suggestion that there were any overarching performance issues or that her job was somehow in danger.  In particular, two senior attorneys in the Global Insurance Services Practice Group, Pomerantz and Wrynn, praised Jones and had many positive comments about Jones' work for the Firm.  For example, Pomerantz stated, as to her "Work Product" as follows:

> "Marissa has done excellent quality work in the short time I have seen her in action.  She is bright and thoughtful and spots issues that are within her prior experience as in-house and as outside regulatory counsel.  She is articulate and writes well."

(A copy of excerpts from the Performance Review is annexed hereto as **Exhibit D**.)

49.     However, in one particular written comment, Pomerantz's discriminatory attitude revealed itself. He stated with respect to "Overall Education" as follows:

> "We do not view Marissa on a partnership track because she works until 5pm and leaves after that most days. We understand that she had a newborn not too long ago. However, we all have our personal challenges … and sacrifices to make. We all need to juggle. I do not believe she wants to make the necessary sacrifices to achieve the next level."

*Id.*

50.     Jones knew she had already shown that she was willing to make sacrifices for the Firm. Jones was utterly shocked and disturbed when she read those words. At the time Jones' Performance Review was provided to her, her daughter was less than six months old and Jones had already been back at work for nearly five months.

51.     This Performance Review, and Pomerantz's comments, were formally approved by the Firm when the Performance Review was promulgated to Jones, showing that the Firm, contrary to its purported "family-friendly" policies, endorsed and was fully supportive of Pomerantz's negative approach to women with children in the workplace.

52.     As a striking example of Pomerantz's negative and inappropriate comments to Jones about her having children and working, in March 2015, Jones stopped at Pomerantz's office to give him an update regarding an upcoming NAIC Conference schedule. Jones and Pomerantz discussed sending an invitation to Kathleen Castano ("Castano") from the Chubb Corporation. Pomerantz started telling Jones what a "rockstar" Castano was, how Castano had worked her way up and was a very successful business woman. Then Pomerantz, looking straight at Jones with emphasis and gravity in his voice, told her how Castano had never had children and instead chose to focus on her career.

53.     It is evident that Pomerantz was telling Jones that she should not have had children if Jones had wanted to be a successful professional.  Pomerantz's communications to the effect that women who have families cannot succeed professionally greatly upset Jones.  As discussed in Section D below, Jones' complaint to the Firm's Human Resources Department led directly to her termination.

2.      **Obsessive and Discriminatory Monitoring of Jones' Activities**

54.     Along with Pomerantz's frequent criticism of Jones' telecommuting and childcare responsibilities came a bizarre and discriminatory monitoring of her activities and life. Pomerantz specifically required that Jones advise him as to her whereabouts, at all times.  During the day, Pomerantz would frequently inquire of others about the times that Jones came in or left the office and whether Jones was physically at her desk.

55.     Shortly after beginning their work together, upon information and belief, Pomerantz went so far as to demand that Jones' assistant email him several times a day concerning Jones' location, whether he and Jones were working together or not – whether he had any legitimate purpose to know her physical whereabouts or not.  Jones' assistant refused to participate in such activities.

56.     Jones was not the only woman at the office whom Pomerantz treated inappropriately and harassed.  Upon information and belief, he also repeatedly harassed his own assistant, Julie Kubelka ("Kubelka"), with invasive questions about her (Kubelka's) whereabouts.  There were days when he called Kubelka upwards of thirty (30) times to check on her locale.  As a result of Pomerantz's constant scrutiny and criticisms, Kubelka was demoted; she left the Firm within the next several weeks following her demotion.

57.     There was no Firm-wide policy requiring telecommuters to provide their whereabouts to the Firm on an ongoing basis.  Tellingly, Pomerantz did not impose these reporting requirements on Jones' male colleague from her Group, an attorney who also worked with Pomerantz.  This was despite the fact that the male colleague also had a family and substantial childcare responsibilities for his two young children and a lengthy commute, which led him to be absent from the office quite frequently.  Jones and her male colleague both had two young children, and both had a lengthy commute – yet, Jones was held to a grossly different standard and punished for practicing what the Firm preached.

58.     When Jones joined the Firm, the male colleague in their Group and Jones were both associates.  However, the male colleague was made a partner of the Firm in December 2014, while Jones was being told in her Performance Review that her childcare duties meant that Jones was not "on a partnership track" and would not be made a partner of the Firm.

**3.     Open Hostility and Micromanagement**

59.     Pomerantz also micromanaged and unreasonably criticized Jones' work. Pomerantz spoke to her in a condescending, demeaning and dismissive tone, which Jones had never heard him use with any of the male attorneys in their Group, such as her aforementioned male counterpart.

60.     For example, on March 6, 2015, two weeks before she was terminated, Jones needed to take her daughter to the doctor to determine if she (Jones' daughter) was going to be hospitalized.  Jones had been working from home both before and after the doctor's appointment, and was available by phone and email even while at the doctor.  Jones notified Pomerantz before she left home and then when she got home.  Once home, Jones was again online and worked straight from 12:45 p.m. to 8:00 p.m.  Jones responded to all of Pomerantz's emails and calls,

even while Jones was at the doctor.  Jones did not miss any meetings, calls or deadlines, nor did Jones have to reassign any of her work to anyone else at the Firm.  Pomerantz had no substantive criticisms of her work.  Nevertheless, he later criticized Jones for being "unavailable" to the Firm that day, even though Jones worked a full and productive day and was in fact available and completely responsive.  This was typical of the attitudes and comments of Pomerantz that Jones was forced to endure day-in and day-out, and which displayed his acute gender and family bias and created a hostile work environment.

61.    As another example, on March 13, 2015, Jones was sending out dinner requests to prospective clients for an upcoming NAIC Conference.   In error, Jones wrote the word "available" instead of "availability."  Spellcheck did not pick up the error (because the word was spelled correctly) and when Jones proofed the email, Jones missed the typographical error. Pomerantz called Jones and told her to open her email and read it out loud to him.  Jones did, and Jones read the word as "availability."  Pomerantz said no, go back and read it out loud again, "nice and slowly," speaking to Jones as if she were a child.  Jones said:  "Fred please just tell me what the problem is, and I'm happy to fix it."  He then scolded Jones for her minor error.  Jones explained why she thought the error had happened, and that she would of course correct it and be careful going forward.  Once again, Jones was held to a demeaning double standard and hostile work environment based on her gender and family status.  Indeed on the same day, Pomerantz himself sent out an email to a prospective client that was addressed to the wrong name.  When Jones politely pointed out his error, his only response was, "Oops!"

62.    Jones was deeply offended about being constantly scrutinized and micromanaged by Pomerantz, especially knowing that he did not exact this level of scrutiny with male colleagues.

**4.    Pomerantz's Physical Touching of Himself**

63.    Pomerantz, when meeting with Jones, would repeatedly reach down and touch, stroke and wipe his genital area.  (For purposes of clarity, in her presence Pomerantz did this with his hand outside of, not in, his trousers.)  Jones also observed him doing this at meetings in the presence of others.  This occurred at nearly every single one-on-one or small group meeting between Jones and Pomerantz.

64.    Jones had several conversations with the Firm's partners, management and others at the Firm who had observed this conduct.  Pomerantz's behavior was obvious and widely known;  yet, it continued at the Firm unabated and continued at nearly every single one-on-one or small group meeting between Jones and Pomerantz.

65.    Jones and several of her colleagues were repulsed by the conduct and unable to understand the Firm's tolerance of it.  Jones' assistant advised Jones that she had asked Pomerantz directly to stop it, but he continued to display this behavior unimpeded.  As set forth in Section D below, Jones' complaint about this sexually charged conduct and hostile work environment toward her and other women was evidently one of the factors leading directly to Jones' termination.

**D.    Retaliation, Pretext and Wrongful Termination**

66.    On March 16, 2015, after Jones' conversation with Pomerantz during which he suggested that Jones had made the wrong life choice by having children (see Section C.1 herein), Jones spoke with Sgroi, a Human Resources Administrator from the Firm's main office in Buffalo.  Sgroi was visiting the firm's New York City offices at the time.

67.    Given the opportunity, Jones told Sgroi in person on March 16, 2015, about the comments Pomerantz had made, and then launched into a wholesale discussion about

Pomerantz's pattern of discriminatory comments, his surveillance of Jones, the double standard Jones was experiencing, his discouragement of Jones in client and Firm work, and his touching and rubbing himself when in Jones' presence.  Sgroi stated that she was deeply concerned about Pomerantz's behavior and said she would investigate.

68.     Jones was never advised whether the Firm ever undertook an investigation of Pomerantz's conduct following this conversation, either before or after Jones' wrongful termination.

69.     Later that same day, March 16, 2015, Sgroi sent Jones an email stating:  "Hi Marissa.  After discussing our conversation with Jenn [Jennifer Majewski, another Goldberg Segalla Human Resources professional], I think it best that you speak directly with Dan Gerber [the co-Chair of the Global Insurance Services Practice Group], regarding your situation."

70.     That same day, Jones responded:  "Thank you Kathy.  I just want to confirm that you are going to document our discussion, right?"  Sgroi did not respond to Jones' email. (Copies of the email exchange are annexed as **Exhibit E**.)

71.     Shortly thereafter, Jones telephoned Sgroi to follow up.  Sgroi was rather abrupt, but told Jones that she would document their discussion.   Jones never received such documentation.

72.     Gerber emailed Jones two days later on Wednesday, March 18, 2015, to schedule a call concerning Jones' complaints of discrimination for the afternoon of the following day, Thursday, March 19, 2015.

73.     As a preface to the meeting, Jones decided to send Gerber an email summarizing her discussions with Sgroi and laying out her concerns and complaints of discrimination, harassment, hostile work environment and other inappropriate behavior against Pomerantz and

the Firm and seeking an appropriate response and reasonable help from the Firm (her "Complaint Email"). (A copy of the Complaint Email sent to Gerber is annexed hereto as **Exhibit F**.)

74.    Later that same day, March 19, 2015, Gerber and Jones had their scheduled telephone call. Gerber told Jones that she was being terminated without further notice, and that Jones should collect her things, turn in her laptop, and leave the premises.

75.    Jones was stunned and asked Gerber why she was being abruptly fired, and he said, "performance issues." Jones pressed him for details. Gerber responded with only one specific example, stating that a firm client, Interstate National Dealer Services ("INDS"), no longer wanted to work with Jones because, he said, Jones had been absent from a conference call with an INDS representative. Jones proceeded to explain to Gerber that he was mistaken about the supposed absence. Jones told Gerber the conference call had in fact occurred many months earlier and that Jones had in fact been on the call throughout.

76.    Jones also told Gerber that she continued to work successfully with INDS – both on the particular matter that was the subject of the call (that Gerber had accused her of missing), and on a subsequent matter as well.

77.    Jones challenged Gerber as to whether INDS really did not want to work with her, but he failed to respond. He also made no reference to Jones' complaint of discrimination and harassment made to Sgroi three days earlier, or to Jones' more recent Complaint Email sent to Gerber earlier that same day.

78.    Upon information and belief, the proffered reason for Jones' termination, namely, "performance issues," is wholly pretextual. The conference call that Gerber accused Jones of not being on, which she was in fact on, occurred in March 2014, approximately one year before Jones' termination. There was no reference to this conference call in Jones' October 2014

Performance Review, which was issued after the conference call, and there was no indication in the Performance Review that Jones had done anything wrong, alienated the client in any way or was in danger of being terminated.

79.     Upon information and belief, the Firm's termination of Jones was pure retaliation for her voiced concerns and claims of discrimination and harassment about Pomerantz's inappropriate and sexually charged behavior and the hostile work environment he had created – claims which Jones had raised only days before being terminated.

80.     The Firm's response to and retaliation against Jones for her complaints also violated the letter and spirit of the Firm's procedures for addressing complaints of discrimination, which offer the following protections and procedures:  (1) "Of course, any offended employee may discuss the situation with his or her immediate supervisor and/or the Human Resources Administrator and ask for help to resolve the situation….;"  (2) "If the situation is not resolved, the offended employee should report the harassment to the Human Resources Administrator or a member of the Facilitation Committee, who will promptly respond to the situation in an appropriate manner…..;" and (3) "Goldberg Segalla will not tolerate retaliation against an employee who files a complaint in good faith."  (A copy of the relevant portions of the Firm's Employees' Handbook is annexed as **Exhibit G** hereto.)

81.     A firm of experienced lawyers should be held to the very highest standard of compliance with the law.  Instead of acting within the law and its own internal procedures, the Firm and its management discriminated against and retaliated against an attorney who had done nothing more than complain about the discriminatory and harassing conduct of the Firm and its partner Pomerantz.

E.      **Notice of Right to Sue**

82.      On July 1, 2015, Jones filed a charge of discrimination embodying her claims set forth in this complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"), the New York State Division of Human Rights and the New York City Commission on Human Rights.

83.      On June 6, 2016, the EEOC issued a Notice of Right to Sue to Jones.

**FIRST CLAIM BY PLAINTIFF JONES**
**AGAINST DEFENDANT GOLDBERG SEGALLA**
**(Unlawful Employment Discrimination in Violation of 42 U.S.C. § 2000e *et seq.*)**

84.      Jones repeats and realleges each and every allegation contained in paragraphs 1 through 83 of this complaint.

85.      Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* prohibits, among other things, discharging, harassing, retaliating or discriminating against an employee based on her sex.

86.      Starting in or about July 2014, Goldberg Segalla initiated a continuing campaign of discrimination against Jones based on Jones' gender and based on the "gender plus" factor of her being a woman caring for children, which continued through her wrongful termination in March 2015.

87.      Moreover, during this period of time, Goldberg Segalla and its partner Pomerantz created an intimidating, hostile and offensive work environment for Jones through their discriminatory comments and practice, and as a result of Pomerantz's sexual misconduct.

88.      Finally, upon information and belief, both as part of the aforesaid campaign of discrimination and as retaliation against Jones for her reporting of discrimination and sexual misconduct, Goldman Segalla terminated Jones' employment on March 19, 2015.

89.     These actions, taken singly and in their entirety, constitute unlawful discrimination in violation of 42 U.S.C. § 2000e *et seq.*

90.     As a direct, proximate and foreseeable cause of Goldberg Segalla's violations of 42 U.S.C. § 2000e *et seq.*, Jones suffered humiliation, embarrassment, mental and emotional discomfort, damage to her reputation and economic opportunities, and loss of wages, other compensation and benefits.

91.     As a further proximate result of Goldberg Segalla's unlawful employment practices, Jones has had to incur attorney fees, costs and incidental expenses.

92.     As a result of the wrongful actions of Defendant Goldberg Segalla, Plaintiff Jones is entitled to recover actual damages and punitive damages in an amount to be proven at trial.

### SECOND CLAIM BY PLAINTIFF JONES
### AGAINST DEFENDANTS GOLDBERG SEGALLA AND POMERANTZ
**(Unlawful Employment Discrimination in Violation of the
New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*
and the New York City Civil Rights Law,
Administrative Code of the City of New York § 8-101 et seq.)**

93.     Plaintiff Jones repeats and realleges each and every allegation contained in paragraphs 1 through 92 of this complaint.

94.     The New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Civil Rights Law, Administrative Code of the City of New York § 8-101 *et seq.* ("NYCHRL") prohibit, among other things, discharging, harassing, retaliating or discriminating against an employee based on her sex.

95.     Starting in or about July 2014, Goldberg Segalla initiated a continuing campaign of discrimination against Jones based on Jones' gender and based on the "gender plus" factor of her being a woman caring for children, which continued through her wrongful termination in March 2015.

96.     Moreover, during this period of time, Goldberg Segalla and Pomerantz created an intimidating, hostile and offensive work environment for Jones through their discriminatory comments and practice, and as a result of Pomerantz's sexual misconduct.

97.     Finally, both as part of the aforesaid campaign of discrimination, and as retaliation against Jones for her reporting of discrimination and sexual misconduct, Goldman Segalla terminated Jones' employment on March 19, 2015.

98.     These actions, taken singly and in their entirety, constituted unlawful discrimination in violation of the NYSHRL and the NYCHRL.

99.     As a direct, proximate and foreseeable cause of Defendants' violations of these statutes, Jones suffered humiliation, embarrassment, mental and emotional discomfort, damage to her reputation and economic opportunities, and loss of wages, other compensation and benefits.

100.    As a further proximate result of Defendants' unlawful employment practices, Jones has had to incur attorneys' fees, costs and incidental expenses.

101.    As a result of the Defendants' wrongful actions, Plaintiff Jones is entitled to recover actual damages under NYSHRL and NYCHRL in an amount to be proven at trial, but in no event less than $1,000,000, and punitive damages in the amount of no less than $1,000,000.

**WHEREFORE**, Plaintiff Jones demands judgment against Defendants Goldberg Segalla and Pomerantz, as set forth herein, and for such other further relief as the Court deems just and proper, including actual damages, attorneys' fees, punitive damages, interest and costs.

## JURY DEMAND

Plaintiff Jones hereby demands a trial by jury of all issues so triable.


Dated: New York, New York
August 31, 2016


REAVIS PARENT LEHRER LLP

By:

Mark H. Moore
41 Madison Avenue
41st Floor
New York, New York 10010
(212) 763-4100

Attorneys for Plaintiff
Marissa T. Jones, Esq.